IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-00294-PAB

UNITED STATES OF AMERICA,

　　　　　Plaintiff,

-vs-

DIANE DALMY,

　　　　　Defendant.

---

## MOTION TO TERMINATE
## SUPERVISION PURSUANT TO 18 U.S.C. § 3583(e)

---

I, Diane Dalmy, proceeding *pro se*, herewith move the Court to terminate my supervised

release pursuant to this Court's authority to do so under 18 U.S.C. § 3583(e).

　　　1.　　***History:***　　　I pled guilty to an information charging me with one count of

conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, which conspiracy was a

violation of 18 U.S.C. § 371. *Amended Judgment in a Criminal Case,* Dkt.54, entered December

11, 2018.[1]  On May 16, 2019, I was sentenced to 36 months' imprisonment, a three-year term of

---

[1]　　　Unless otherwise noted, all references to the record are to the Docket in *United States v. Dalmy,* Case No. 3:18CR00021-001, in the United States District Court for the District of Connecticut. The District of Connecticut transferred jurisdiction for my supervised release by *Transfer of Jurisdiction,* Dkt. 111, entered June 14, 2023.  That *Transfer of Jurisdiction* appears in this Court's docket entered June 13, 2023, as Dkt. 1.

supervised release, a special assessment of $100.00, and restitution of $2 million. *Judgment in a Criminal Case,* Dkt. 21.

2.      After sentencing, the Government found that I had failed to report to the U.S. Probation Office that I had $47,000 in cash, which I had hidden away in a chest I had placed in storage. I had intended that the money be available to me when I was released, in part to pay for a knee replacement operation and recovery (although my intent is not an excuse for my willful failure to disclose the money and false representation that my listing of assets and liabilities was complete). As a result of my nondisclosure and although I had paid approximately $16,000 in restitutio9n prior to self-surrender, the Court resentenced me pursuant to 18 U.S.C. § 3614(b)(1) for willfully failing to pay restitution, imposing incarceration of 60 months, with all other provisions of the sentence remaining unchanged. *Amended Judgment, supra.*

3.      I self-surrendered on July 16, 2018, and served my sentence at FCI Phoenix until October 1, 2020, at which time I was designated to serve the remainder of my sentence on home confinement pursuant to authority granted to the Bureau of Prisons by *The CARES Act*, Pub.L. 116-136, 134 Stat. 281 (March 27, 2020), codified in 18 U.S.C. § 3621, NOTES: BUREAU OF PRISONS. On July 14, 2023, I will have completed 18 months, one-half of my 36-month term of supervised release.

4.      I served both my sentence of incarceration and home confinement without any disciplinary actions, earning credit under 18 U.S.C. § 3632(d) for completing evidence-based recidivism reduction programming.  I have been gainfully employed since October 2021, as I describe *infra.*

5.      ***Conduct on Supervised Release:*** Pursuant to my *Amended Judgment in a Criminal Case,* I am obligated to pay 10% of my gross income (with a minimum payment of

$500.00) toward my restitution obligation, commencing with my term of supervised release. Since I began supervised release on January 14, 2022, my gross income has been $122,867.77. I have paid $12,452.61 in restitution since beginning supervised release, which amounts to 10.14% of my gross income over this period.  In May 2023, I paid $816.61, which amounted to 10.26% of my income.

6.      My *Amended Judgment in a Criminal Case* (Dkt. 54, entered December 11, 2018) set as a special condition of my supervised release that I "must participate in a program recommended by the United States Probation Office and approved by the Court for mental health treatment." *Id.* at p.1. According to the Probation Officer, I was required to participate in bi-weekly treatment for three months for multiple issues.[2]  I began mental health treatment in April 2022, completing the three-month regimen in November.[3]  By the end of 2022, I had completed over four full months of therapy.

---

[2]      *See* Government untitled filing (Dkt. 85), April 25, 2022, at p.5.

[3]      Within a month of beginning supervised release, I appeared as directed for my mental health evaluation.  On March 25, Kevin De Leon, the Federal Program Coordinator at the halfway house that oversees the mental health aftercare, notified me that I had my first mental health individual therapy session set for April 3, 2022.  The sessions were to occur twice monthly.  I attended the April 3 session, where I found that the therapy program was beneficial. I became enthusiastic about it.

While I was recovering from knee surgery two weeks later, I received a call from Mr. DeLeon informing me that the counselor whom I had seen on April 3, 2022, had quit. He said he would let me know when a new one had joined the mental health staff and I would be able to resume sessions.  After a two-week surgical convalescence, I contacted Mr. DeLeon and scheduled a mental health therapy session by Zoom video conference with a counselor named Brooke. Mr. De Leon told me that my Probation Officer would have to approve my receiving counseling through telehealth sessions.

My Probation Officer told me on May 5, 2022, that I would not be receiving therapy from Brooke, but rather that she would identify a more suitable counselor for me. *See* email I sent to her, attached as **Exhibit 1.**  My Probation Officer selected a replacement therapist in mid-August

7.      Although November marked the end of the three-month period of mental health counseling that my Probation Officer required, I have continued such treatments voluntarily because I found them to be beneficial. I intend to continue to do so.

8.      My *Amended Judgment in a Criminal Case* also set as a special condition of my supervised release that I must not incur new credit card charges above $500.00 or open additional lines of credit without the approval of the probation officer. I have complied with this condition.

9.      ***Background:***  I am a 68-year-old single mother with three adult children and four grandchildren. My daughter Marian Dougherty, her husband and their two children live in Portland, Oregon.  My adult daughter, Ashley Dalmy, is a law student in Seattle, Washington. My son Adrian lives with a son and daughter in nearby Westminster, Colorado.

10.      From 1989 through my conviction, I held a license to practice law. Since being released to home confinement in October 2020, I have worked for Whole Foods, a position that keeps me on my feet for my entire shift. I currently gross about $1,500 monthly from that position.  I also collect net social security retirement benefits of about $2,200 monthly, an amount which has already had taken from it 15% by the government toward restitution.

11.      Since February 2022, I have been performing certain paralegal services, including drafting of initial documents, legal research, for Attorney Henry F. Schlueter.[4]  Attorney Schlueter is licensed to practice in Colorado, but lives and works in Hong Kong. Pursuant to

---

2022. I resumed mental health therapy in September, which explains how a three-month treatment regimen took seven months to complete.

[4]      I also performed independent contract work for Robin Hult CPA until spring 2022, at which time the business's finances did not permit Mr. Hult to continue to pay me for work. I count Mr. Hult as a friend, and I have helped him on some matters since then, but not for compensation.

contract, I am paid $5,000 monthly for my work. Attorney Schlueter and I have discussed Colorado *Rule of Professional Practice* 5.5(b) and (c), which permits his employing a disbarred attorney "to perform research, drafting or clerical activities, including but not limited to (1) legal work of a preparatory nature, such as legal research, the assemblage of data and other necessary information, drafting of pleadings, briefs, and other similar documents," provided the disbarred attorney does not provide legal advice, negotiate for, appear for, handle client funds, or otherwise "engage in activities that constitute the practice of law." All of my work for Attorney Schlueter has been performed in a manner consistent with the *Rules of Professional Practice*.

12.     As a child, I was adopted through the work of an agency then known as the Lutheran Family Services Rocky Mountain, and now as "LFSRM." My adopted family was far from perfect: I was raised by an abusive father who suffered from alcoholism, and our situation was such that I worked to pay my way through college and law school. Nevertheless, after being released from custody and upon completing my knee surgery last spring, I wanted to do more than merely work (even work two jobs). Therefore, I contacted LFSRM – which now works to resettle refugees as well as in adoption work – and volunteered to help with its work.

13.     In September 2022, LFSRM placed me in charge of a family of eight incoming refugees from the Democratic Republic of the Congo (that had spent 15 years in Rwanda, all of which was in a refugee camp). *See* email, attached as **Exhibit 2.** When I met them the day after I received notice that they had arrived, I helped them move into their ground floor apartment five blocks from my own. I found they lacked food, clothes or toys for the five children under the age of 15. Since then, I have devoted considerable time to this family, all of whom – especially the youngsters – are amazing and delightful. I tutor the three youngest in English every Wednesday night. I take the kids to the park on Sundays (with exception of the infant), to events around

Denver, soccer games.  I assist Claudine (the wife and mother) with grocery shopping and take

Mr. Simon to medical appointments. The family has no transportation. I have assisted in

enrollment of all children in public schools and summer camps so that they may continue with

their learning over the summer. .

        14.     In the month the family arrived, I spent about $300.00 helping establish them with

food, clothing and toys for the younger children.  I have taken the family's children to Red

Rocks Park and now attempting to teach them how to swim.  Our volunteer group (there are

three of us and I am the captain) was able to get bikes donated for all the children several weeks

after they arrived, and I have taught the children how to ride. I am still regularly taking the

children bicycle riding.  When Tresor's bicycle was stolen late last winter, I was able to arrange

the donation of a bicycle from a nearby store.

        15.     Prior to my incarceration, I worked with the Mwebasa Foundation.  The

Foundation connects Colorado schools with Ugandan schools, describing its mission as

"build[ing] relationships based on trust and respect by co-creating cross-cultural education

activities and global studies curriculums. Students become change-makers advocating for and

creating systems rooted in justice."[5] Since my release more than a year and a half ago, I have

created curricula for one of the Foundation's schools in Uganda.  *See* letter from the Foundation,

attached as **Exhibit 3**.  The Mwebasa Foundation has asked me to come to Uganda when

possible to assist with teaching students and working with young leaders there, and I want to do

so.

---

[5]      *See* https://www.mwebaza.org/home (last accessed June 21, 2023).

16.     I have traveled outside the jurisdiction three times since I began supervised release, each time to visit my children and grandchildren in Oregon or Washington. My daughter in the Seattle area plans an October wedding in Europe because our family lives there, and I want to be in attendance for her marriage vows. As well, I want to see my grandchildren more than a few times a year, and be available to stay for extended periods to assist my daughter in Portland who travels considerably internationally as she is employed with Nike.[6]

17.     I have substantial financial headwinds, which I am working to address. I liquidated my retirement funds in 2016 to help my son open a business. The business failed because of the indictment, leaving me with a substantial federal tax obligation arising from the retirement fund withdrawal. While I was incarcerated, the Securities and Exchange Commission obtained a judgment against me in a civil action. I only discovered the judgment when I had a real estate friend gather information about my residence to determine its value (which turned out to be less than the balance of my mortgage and the liens for restitution and the SEC judgment).

18.     ***Law Relating to Supervised Release****:*  Congress established supervised release in 1984. *United States v. Haymond*, 588 U.S. --- , 139 S. Ct. 2369, 2382, 204 L. Ed. 2d 897 (2019), with the intention of "assist[ing] individuals in their transition to community life." *United States v. Johnson*, 529 U.S. 53, 59 (2000).  Supervised release is not intended to be punitive.  Instead,

---

[6]     The U.S. Probation Office has a policy against being out of the jurisdiction for longer than two weeks.  Because the independent contractor work I perform for Attorney Schlueter can be done anywhere I have Internet access with my laptop, I am able to visit my daughters and help with childcare for extended periods while only losing about 12 hours weekly at Whole Foods.

My Whole Foods take-home pay typically amounts for under 12% of my monthly income, so the loss of that income for a month does not substantially affect my restitution payment.  In May 2023, for example, my Whole Foods take-home pay constituted 9.54% of my income for the month.

unlike parole, supervised release was introduced "only to encourage rehabilitation *after* the completion of his prison term." *United States v. Fresquez*, Case No. 07-cr-00403-NYW-2 (D. Colo. June 16, 2023), 2023 U.S. Dist. LEXIS 105501, at *5, citing *Haymond, supra* at 139 S. Ct. 2382 and United States Sentencing Commission, GUIDELINES MANUAL ch. 7, pt. A(2)(b) (Nov. 2012) (emphasis in original). "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *Fresquez, supra,* citing *Johnson, supra* at 529 U.S. 53-54.

19.     Thus, "supervised release, in contrast to probation, is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it is "a separate and additional period of monitoring concerned with facilitating the reintegration of the defendant into the community... supervised release must follow imprisonment; it cannot be imposed on its own. These differences reflect the rehabilitative character of release by fully disaggregating the punitive and transitional phases of a defendant's sentence." *United States v. Trotter*, 321 F.Supp.3d 337, 345-46 (E.D.N.Y. 2018), *quoting* Mica Moore, *Escaping from Release: Is Supervised Release Custodial under 18 USC § 751(a)?*, 83 U. CHI. L. REV. 2257, 2260-61 (2016).

20.     A congressional statement of policy accompanying the *Sentencing Reform Act* succinctly stated the rehabilitative purpose of supervised release:

> The primary goal of [Supervised Release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release.

S.REP. No. 98-225, at 124 (1983), *as reprinted in* 1984 USCCAN 3182, 3307.

21.     Supervised release may be terminated early at the discretion of the district court, "at any time after the expiration of one year of supervised release... if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1).  The court must consider several factors in deciding on early termination:

(i)     "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1);

(ii)    the need for the sentence imposed "to afford adequate deterrence to criminal conduct," *id.* at § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," *id.* at § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," *id.* at § 3553(a)(2)(D);

(iii)   the "kinds of sentence and the sentencing range established for the applicable category of offense [or violation of probation or supervised release] committed by the applicable category of defendant" under the Sentencing Guidelines, *id.* at § 3553(a)(4);

(iv)    "any pertinent policy statement issued by the Sentencing Commission," *id.* at § 3553(a)(5); and

(v)     "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct..." *id.* at § 3553(a)(6).

*United States v. Lussier*, 104 F.3d 32, 35, 36 (2ⁿᵈ Cir. 1997); *United States v. Harris*, 689 F.Supp.2d 692, 694 (S.D.N.Y. 2010); *United States v. Sheckley*, 129 F.3d 114 (Table Case), opinion at 1997 U.S.App.LEXIS 32024] (2nd Cir. 1997).  As well, a district court may terminate a term of supervised release only "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice..." *United States v. Begay*, 631 F.3d 1168, 1171 (10th Cir. 2011), citing 18 U.S.C. § 3583(e)(1).

22.     Supervised release is imposed as a part of nearly every sentence, despite the fact that "it is required in fewer than half of federal cases." *United States v. Thomas*, 346 F.Supp. 3d 326, 334 (E.D.N.Y. 2018), citing Christine S. Scott-Hayward, *Shadow Sentencing: The*

*Imposition of Federal Supervised Release*, 18 Berkeley J. Crim. L. 180, 192 (2013) (judges in the Eastern District of New York impose supervised release in 94% of cases). "It is accompanied by the "threat of never-ending supervision" due to violations of supervised release conditions, which may result in incarceration and/or lengthened terms of supervised release." *Thomas, supra, citing* Nora V. Demleitner, *How to Change the Philosophy and Practice of Probation and Supervised Release: Data Analytics, Cost Control, Focus on Reentry, and a Clear Mission*, 28 FED. SENT'G REP. 231, 232 (2016).

23.     A court's authority to grant early termination of supervised release "provides an opportunity to reevaluate the efficacy of a supervised release term throughout its duration. Termination is appropriate when the rehabilitative goals of supervised release may no longer be attained or can be attained at too great a cost to the defendant and society." *Thomas, supra* at 346 F.Supp. 335, *citing Trotter, supra* at 321 F.Supp.3d 364 (terminating supervised release for a habitual user of marijuana when continued supervision was unlikely to rehabilitate him.)

24.     There appears to be no precise definition of the "ends of justice;" rather, it is "a flexible concept uniquely tailored to the facts of each case." *100 Mount Holly Bypass v. Axos Bank*, Case No. 2:20-CV-856 (D. Utah July 27, 2021), 2021 U.S. Dist. LEXIS 140829, at *49 ("ends of justice" application in RICO case); *Wesley v. Massey*, Case No. 98-6354 (10th Cir. Aug. 23, 1999), 1999 U.S. App. LEXIS 20050 at *4 ("Although we have never defined "ends of justice" in this context [deeming failure to file objections to magistrate report as waiver unless "ends of justice" dictate otherwise], we have excused the failure to file timely objections only in the rare circumstance in which a represented party did not receive a copy of the magistrate's report").

25.     My case originated in Second Circuit. In that Circuit, *Lussier* is the leading

decision on early termination. Some courts have read *Lussier* to require a finding of "new or

unforeseen circumstances" or "exceptionally good behavior" in order to justify early termination.

*Id.* at 104 F.3d 36. *See, e.g., United States v. McKay*, 352 F.Supp.2d 359, 361 (E.D.N.Y. 2005)

(early termination not warranted "simply because [defendant] has successfully served a portion

of his supervised release"). However, this Circuit has since made clear that "the plain language

of *Lussier*... does not require new or changed circumstances relating to the defendant in order to

modify conditions of release, but simply recognizes that changed circumstances may in some

instances justify a modification. So long as the court, when modifying supervised release

conditions, considers the relevant 18 U.S.C. § 3553(a) sentencing factors, there is no additional

requirement that it make a finding of new or changed circumstances with respect to the

defendant." *United States v. Parisi*, 821 F.3d 343, 347 (2nd Cir. 2016).

26.     ***Argument:*** After serving half of my supervised release (as of fewer than three

weeks from now), I have reintegrated into the community. I am of retirement age and collect

social security, but I nonetheless hold an employment position and perform substantial work as

an independent contractor. As well, I contribute to the betterment of fellow humans by working

closely with an immigrant family and donating my time and energies to a foundation that

educates children and develops cultural ties.

27.     I have fully met the conditions of my supervised release.  Because of the cost of

maintaining my condominium apartment, not to mention my tax and restitution obligations, I

must continue to work at least as an independent contractor for the foreseeable future. Yet, in the

first 16 months of supervised release,[7] I have paid over $13,700 in restitution, and I will add

---

another $800-plus to that amount when I make a payment in the first week of July. Restitution is

withheld from my social security payment by the Treasury, and I have demonstrated that I am

diligent in paying restitution on other amounts of gross income.  I have completed more than

twice the amount of mental health counseling that the Probation Office found to be necessary.

28.    The benefits of supervised release, usually quite clear during the initial months of

the term, lessen as the term progresses.  Encouragement of strong family bonds and financial

responsibility are among the purposes of supervised release. *See United States v. Cacho*, 951

F.2d 308, 311 (11th Cir. 1992), quoting U.S.S.G. 5H1.2 9 ("If a defendant is sentenced to

probation or supervised release, family ties and responsibilities that are met may be relevant in

the determination of the length and conditions of supervision"); *United States v. Canoy*, 38 F.3d

893, 904 (7th Cir. 1994) (same holding).  At this point, however, development of my family ties

are being hobbled by continued supervision that continues to cost the government in excess of

$2,200.00 annually.[8]  If I am prevented from international travel to my daughter's wedding in

October, family relationships will be further strained.

29.    No one can fairly question the benefits that flow from charitable donation of

resources and skills to organizations performing educational and cultural enrichment. Having

written a curriculum for the Mwebasa Foundation, I am eager to accept the Foundation's

---

[7]    Restitution is paid in arrears.  My last payment on June 4, 2023, paid the month of
May 2023, my 16th month on supervised release.

[8]    Administrative Office of United States Courts, *Incarceration Costs Significantly
More than Supervision* (August 17, 2017), found at
https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision
(last accessed May 22, 2023).

invitation to teach the curriculum at its schools in Africa.  Continued supervision at this point would interfere with my ability to contribute to the organization's educational and cultural goals.

30.     Having completed twice the mental health counseling that the U.S. Probation Office has specified that I undergo, I have no need for further services from the Office. I led an offense-free life until my securities offense, and while I have substantial SEC and federal court restitution and forfeiture penalties, what I gained from the offense was only the same hourly billing I collected from other clients. I deeply regret my offense as well as my terrible judgment in concealing some of my assets. That I did so out of fear that I would be unable to pay for needed medical care after I was released does not excuse breaking the law. I knew it then and I know it now.  Despite being unable to ever regain my law license and being without retirement savings and deeply in debt, I have reintegrated into the community and looked beyond my personal needs and interest to try to help others.

31.     The ends of justice would be served by terminating my supervised release at this time. There is no reason to believe that the public needs any protection from me, I have no need for further services, the nature of my offense and my history do not suggest the need for further supervision, nothing in the Sentencing Guidelines suggests that this *Motion* should not be granted, and there remains no need for rehabilitation. *See Lussier, supra* at 104 F.3d 36 (rehabilitation is function of supervised release).

32.     On July 19, 2019, the U.S. Department of Justice released a proposed risk assessment model, known as PATTERN, to determine whether federal prisoners present a risk of recidivism.[9] Prior to my release, I was scored as a minimum risk for committing further offenses.

---

*First Step Act of 2018: Risk and Needs Assessment System* at pp. 52-54. There are three higher levels, but none lower. *Id.* at Table 4, p. 58.

33.     ***Conclusion:***   Application of the relevant § 3553(a) factors and considering the ends of justice, this Court should terminate my supervised release.

WHEREFORE, because I represent such a minimum risk of recidivism, this *Motion* should be granted and my supervised release should be terminated. The statements of fact made herein are true, under penalty of perjury.

Executed June 27, 2023

Diane Dalmy
Reg. No. 25737-014
2000 East 12th Avenue, #32
Denver CO 80206
(303) 870-4211
ddalmy@earthlink.net

---

[9]     Dept of Justice, The First Step Act of 2018: Risk and Needs Assessment System (July 19), found at https://www.nij.gov/documents/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf (last visited June 20, 2023).

## CERTIFICATE OF SERVICE

I herewith certify pursuant to 28 U.S.C. § 1746 that I have transmitted a manually-signed

original of the foregoing *Motion for Early Termination* by causing the same to be sent through

first-class mail, postage prepaid, addressed to the following:

> Clerk of Court
> U.S. District Court for
>    District of Colorado
> 901 19th Street, Room A105
> Denver CO, 80294-3589

and I have served a true and complete copy of the same by ~~depositing said document by first-~~ hand delivered

~~class mail, postage prepaid~~, addressed to the following:

J.D. Rowell
Office of United States Attorney
1801 California Street
Suite 1600
Denver, CO 80820

Damillah Williams
U.S. Probation Office
1929 Stout Street, Ste. C-120
Denver CO 80294

The foregoing statements are true under penalty of perjury.

Executed June 27, 2023

_____
Diane Dalmy